IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF SICILY M. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SICILY M. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

AUTUMN M., APPELLEE, AND BRANDON R., SR., APPELLANT.

Filed June 28, 2016.    No. A-15-1229.

Appeal from the Separate Juvenile Court for Douglas County: ELIZABETH CRNKOVICH, Judge. Affirmed.

Joe Bradley for appellant.

Donald W. Kleine, Douglas County Attorney, and Jennifer C. Clark for appellee State of Nebraska.

INBODY, PIRTLE, and BISHOP, Judges.

PIRTLE, Judge.

### INTRODUCTION

Brandon R., Sr., appeals the order of the Separate Juvenile Court for Douglas County which terminated his parental rights as to the minor children, Sicily M., Rayln M., and Brandon R., Jr. He asserts the court erred in finding that termination of his parental rights was in the children's best interests. For the reasons that follow, we affirm.

BACKGROUND

On January 15, 2014, the State filed a petition alleging Sicily, Rayln, and Brandon Jr. came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) due to the faults or habits of their biological mother, Autumn M. A motion for temporary custody was filed on the same day. The juvenile court determined the children came within the meaning of § 43-247(3)(a) due to the faults or habits of Autumn on January 15 and filed an order for immediate custody.

On August 27, 2014 the court appointed an attorney for Brandon, the putative father of Rayln and Brandon Jr. Brandon filed a complaint for leave to intervene on November 25, 2014. DNA test results from the DNA Diagnostics Center in Omaha were provided to support his complaint. The results stated there was a 99.999 percent probability that Brandon was the biological father of all three children.

A supplemental petition was filed on December 8, 2014 alleging the children came within the meaning of § 43-247(3)(a) due to the faults or habits of Brandon. The petition alleged that (A) Brandon failed to take timely steps in order to reunify with the children; (B) Brandon's use of alcohol and/or controlled substances placed the children at risk for harm; (C) Brandon's whereabouts were unknown; (D) Brandon failed to provide the children with safe, stable, and/or appropriate housing; and (E) Brandon failed to provide proper parental care, support, and/or supervision. The State also filed an ex parte order for immediate temporary custody to exclude Brandon's home. On March 4, 2015, the State filed a motion to dismiss the supplemental petition without prejudice. The motion was granted on March 5.

Brandon was given leave to intervene and was made a party to the proceedings on March 12, 2015. The court found that the permanency objective for the children was reunification, with a concurrent plan of adoption. The court also found that reasonable efforts had been made to return the minor children to the parental home. Services provided included a chemical dependency evaluation, family team meetings, case management, hair follicle testing, and placement. The juvenile court ordered the children to remain in the temporary custody of the Nebraska Department of Health and Human Services (DHHS) and that no further reasonable efforts were required for Autumn.

On June 8, 2015 the family support worker for the children received notice that the Interstate Compact for Placement of Children (ICPC) request was approved for the children to be placed with a relative in Kansas. On June 16, the children were officially placed with Linda R., their maternal great-aunt, in Wichita, Kansas. On July 30, the State filed an ex parte order for immediate temporary custody, requesting that DHHS retain custody of the children, and that Brandon's home be excluded as an option for placement. The State also filed a motion for termination of Autumn's parental rights.

On August 13, 2015, the State filed a second supplemental petition and motion for termination of Brandon's parental rights. The petition alleged the children came within the meaning of § 43-247 and § 43-292 because Brandon was aware the children were in foster care and failed to make efforts to reunify with them, failed to consistently visit, and failed to maintain contact with caseworkers. It alleged that due to these allegations, the children were at risk for harm.

The petition also alleged grounds for termination existed under § 43-292(2) and (7), and that termination of Brandon's parental rights was in the children's best interests.

In August 2015, after a hearing regarding the second supplemental petition, the court found that due to exigent circumstances, it would be contrary to the health, safety or welfare of the minor children to be returned home. The court found that reasonable efforts had been made to prevent or eliminate the need for removal, and that it was in the best interests of the children to remain in the temporary custody of DHHS for appropriate care, education, and maintenance outside of Brandon's home. The order provided that Brandon "shall have reasonable rights of visitation" as arranged and supervised by DHHS.

An adjudication hearing was held on October 30, 2015 and the matter was continued to November 20 to allow for the presentation of additional evidence. The court ordered that the motion for termination of parental rights would be heard on November 20.

Cynthia Lee is a family permanency specialist for Nebraska Families Collaborative, and she testified regarding her role as an advocate for the best interests of children and families, and her involvement with the children in this case. She testified that she sets up therapy and visitation appointments, and meets with parents and providers to ensure that everyone's needs are being met.

Lee testified that she was assigned to this case from January 2014 to May 2014. At that time, Autumn was the only parent involved in the case. At the inception of this case, there were no efforts made to locate the father or fathers of the children because Autumn did not provide Lee with enough information to do so. Rachelle Lauritsen was the caseworker from May 2014 to December 2014, and then Lee was reassigned to the case in December 2014 or January 2015.

When the case was transferred back to Lee, Lauritsen informed her that she had located Brandon in Kansas. Lauritsen said that Brandon had attended a few visits with Autumn, although he was not authorized to do so. Brandon provided a urinalysis sample at one of the visits and tested positive for marijuana. Lee made contact with Brandon by telephone and he said that he wanted placement of the children. He told Lee that the children had been in Autumn's custody because of his incarceration, but that the children resided with him prior to that time. Lee did not ask how long he was incarcerated, and testified that when she first spoke to him, he had already been released.

In March and April 2015, Brandon had supervised visits with the children when he came to Omaha, and he had "a couple" phone calls with the older two children while they were in a foster home. Lee testified that Brandon would call and let her know when he planned to travel from Kansas to Omaha for visits with the children, and she would put in a request for a worker to supervise the visit. Lee testified that because Brandon was coming from out of state, the workers were instructed to call to verify that he was in Omaha before transporting the children for visits. If he could not be reached, the children were not transported for a visit, even if one had been scheduled to occur. Lee testified that it was difficult to reach Brandon by telephone. Lee's affidavit in support of placement outside of the parental home states that on numerous occasions Brandon could not be reached because his voice mailbox was full or his phone was not accepting incoming calls. On one occasion Brandon's girlfriend called to inform her that Brandon was detained by the police and he would not be able to attend the scheduled visit. On other occasions, Lee was not made aware of why Brandon could not be reached, or why he did not return her calls.

When Brandon expressed an interest in having placement, Lee asked if Brandon wanted her to start an ICPC request to assess his home in Kansas and he said "yes." Brandon told Lee that he had housing and was employed, and Lee initiated an ICPC request in March or April 2015. Lee testified that she sent Brandon paperwork to fill out for placement of the children, but he did not sign and return it. When the ICPC request was returned from Kansas, it had been denied. Lee said that part of the reason for the denial was Brandon's failure to contact the Kansas DHHS. He signed for a packet from Kansas DHHS, but did not return it as directed, and he did not return a phone call to the Kansas DHHS regarding the ICPC. Lee said when she asked Brandon why he did not follow through with the ICPC, he told her it "slipped his mind." Lee said he requested that she "do another ICPC." Lee responded that she would discuss it with her supervisor. Lee's supervisor felt that an additional ICPC request would not be needed "because if someone wants their children back, you don't let something like that slip your mind."

Lee said at that point, it was determined that it was best to place the children with Linda, the children's maternal great-aunt, in Kansas. Linda and Brandon resided in the same city, approximately 20 minutes apart. Lee testified that she informed Brandon of the children's placement with Linda, and he was "fine" with that decision.

Lee testified that in June 2015, Brandon told her that he wanted the children placed with him and that he would do whatever was necessary to achieve that goal. Lee told Brandon that he would have to engage in supervised visits, maintain employment, and maintain contact with Lee and the children. Lee testified that she received a telephone call from Kansas DHHS alerting her to the fact that Brandon had an open CPS case that he had not told her about. Lee said that when asked about the CPS case, Brandon told her that he did not think it was important for her to know this information. Lee testified that the only thing Brandon needed to do to demonstrate that he should have placement of the minor children was to complete his orders for Kansas, but he did not do so.

Lee testified that the interactions between Brandon and the children were appropriate and affectionate. Brandon had visits with the children on two or three occasions after the children were placed with Linda in June 2015. Linda told Lee that Brandon attended church services with them a couple of times in June, and attended Brandon Jr.'s birthday party in July. Lee asked Brandon why he was not having more frequent visits, and he told her that he was not able to get into contact with Linda. Lee testified that she immediately contacted Linda, who stated that Brandon had not called her or left messages requesting to see the children.

Lee testified that Brandon had no visits with the children after July 2015, even though he lived in close proximity to Linda. Brandon had permission to speak to the children by telephone, but Lee was not aware of any phone contact while they were in Linda's home. Lee expressed concern that Brandon had not made consistent attempts to visit the children when they lived so close geographically. Lee testified that in her professional opinion, the children were no closer to returning to either parent's home than at the beginning of the out-of-home placement. She testified that she believed that termination of Brandon's parental rights was in the children's best interests. She based this opinion on Brandon's lack of participation in services in Kansas and his lack of contact with the children.

Brandon testified that he was informed that the children were removed from Autumn's home in January or February 2014. He was incarcerated at the time, and was not released until April 2014. Upon his release, Brandon contacted Lauritsen regarding intervening in this case. Lauritsen informed him that he needed to establish paternity of the children, and he completed DNA testing in September 2014. The DNA results became available in November 2014.

Brandon testified that visits were "hit and miss." He stated that when he scheduled visits, he was sometimes informed that the visit needed to be rescheduled because Nebraska Families Collaborative was not able to provide supervision. He testified this happened several times when the children were placed in Omaha, which was a five hour drive from Wichita. He had seven visits with the children while they were placed in Omaha. Brandon testified that once the children were placed with Linda, he was only allowed three visits with the children. He said Linda did not consistently answer the telephone, and when he did reach her, she gave him reasons why he was not allowed to talk to or see the children at that time.

Brandon testified that Lee told him he would need a three-bedroom apartment to get placement of the children. Brandon acknowledged Lee's testimony that she had trouble reaching Brandon because he moved multiple times, but stated that he moved in an attempt to obtain appropriate housing so the children could be placed with him. At the time of the hearing Brandon lived in a three-bedroom, two bathroom house in Wichita, and was employed full-time as a construction worker. Brandon testified that his most recent visit with the children occurred on Rayln's birthday in August 2015.

On November 25, 2015, the juvenile court entered an order terminating Brandon's parental rights. The order found that the children were within the meaning of § 43-247(3)(a), grounds for termination existed under § 43-292(2) and (7), and that termination was in the children's best interests. Brandon timely appealed.

## ASSIGNMENTS OF ERROR

Brandon asserts the juvenile court erred in finding that there was clear and convincing evidence that termination of his parental rights was in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jahon S.,* 291 Neb. 97, 864 N.W.2d 228 (2015). Where credible evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of facts rather than another. *In re Interest of Joseph S.,* 291 Neb. 953, 870 N.W.2d 141 (2015).

## ANALYSIS

Under § 43-292, in order to terminate parental rights, the State must prove, by clear and convincing evidence, that one or more of the statutory grounds listed in this section have been satisfied and that termination is in the children's best interests. The State sought termination of Brandon's rights under § 43-292(2) and (7).

Brandon does not dispute the court's finding that statutory grounds for termination existed. However, for the sake of completeness, we note there is clear and convincing evidence that at least one of the enumerated grounds for termination existed under the statute. Section 43-292(7) authorizes termination when the children have been in an out-of-home placement for fifteen or more of the most recent twenty-two months. The children were removed from their mother's care in January 2014 and remained in out-of-home placement at the time the second supplemental petition was filed in August 2015. Section § 43-292(7) does not require that the child's out-of-home placement be the result of any intentional act on the part of the parent. *In re Interest of Kindra S.,* 14 Neb. App. 202, 705 N.W.2d 792 (2005). The Nebraska Supreme Court has held that this section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *Id.*

Brandon's sole assignment of error is that the juvenile court erred in finding that termination of his parental rights was in the children's best interests. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S., supra.*

The record shows that when the children were removed from their mother's home, Brandon was incarcerated. Upon his release, he contacted the family permanency specialist working with the family and indicated that he wanted the children to be placed with him.

Brandon argues that he has demonstrated a loving relationship with the children, and has shown improvement in his parenting skills. He argues that he participated in genetic testing, and made efforts to have regular visits with the children.

After establishing paternity of the children, Brandon was allowed to have supervised visits with the children. By all accounts, visits did not occur frequently, but there is conflicting evidence as to why certain visits did not occur. Brandon argues that visits in Omaha were "stymied because the supervising agency became unavailable at the last moment." Lee testified that Brandon would call a few days prior to the visit to let her know that he would be traveling from Wichita to Omaha. Lee said that when Brandon notified her that he wanted to visit, she requested a worker to provide supervision. She said sometimes Brandon did not show up for the visit, or she was not able to reach him to confirm that he would attend, so the children were not transported.

In June 2015, the children moved from a foster care placement in Omaha to a family placement in Wichita, Kansas. Linda and Brandon lived in the same town, approximately 20 minutes apart, yet he had few visits from the time of the move to the time of the termination hearing. Brandon argues that the visits with the children in Wichita were infrequent due to communication difficulties with Linda. He testified that Linda did not answer his calls, and when he was able to reach her, she gave a reason why the children were not available to see or speak to him at that time. Lee testified that when Brandon reported this problem to her, she immediately contacted Linda, who stated that Brandon had not called her or left messages requesting to see the children.

The record shows that when Brandon scheduled and attended supervised visits, his behavior was appropriate and he was affectionate toward the children. However there is little additional evidence in the record regarding the nature and quality of the relationship he had with

the children or regarding any improvement in Brandon's parenting skills. When the children resided in Nebraska, Brandon expressed his desire to obtain placement of the children, but he did not follow through with the necessary steps to complete the first step, the ICPC request. Specifically, he did not respond to requests for information from the Kansas DHHS, or return phone calls, and he did not sign and return the paperwork Lee requested. The ICPC request was denied and he indicated to Lee that this step "slipped his mind." Lee testified that a second ICPC was not completed because her supervisor indicated that if a person wanted their children back, they would not let important steps toward that goal "slip [their] mind."

Lee testified that in June 2015, Brandon told her that he wanted the children placed with him and that he would do whatever was necessary to achieve that goal. Lee told Brandon that he would have to engage in supervised visits, maintain employment, and maintain contact with Lee and the children. Kansas DHHS contacted Lee to alert her to the fact that Brandon had an open CPS case in Kansas, and when she asked him about it, he said he did not believe that it was important for her to know this information. The CPS case impacted Brandon's eligibility to have placement of the children involved in this case. Lee testified that the only thing Brandon needed to do to demonstrate that he should have placement of the minor children was to complete his orders for Kansas, but he did not do so.

Lee testified that based upon her training and experience, it was her opinion that termination of Brandon's parental rights was in the children's best interests.

Where credible evidence is in conflict, an appellate court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of facts rather than another. *In re Interest of Joseph S.,* 291 Neb. 953, 870 N.W.2d 141 (2015).

It appears that Brandon had the best of intentions with regard to his children, but he failed to take the initiative to establish and maintain a relationship with the children. There were long periods of time without visits or calls, and Brandon did not take the necessary steps to demonstrate his desire to parent the children. The appellate courts of Nebraska have repeatedly cautioned that children cannot, and should not, be allowed to linger in foster care while waiting to see if the parent will mature. *In re Interest of Chloe C.,* 20 Neb. App. 787, 835 N.W.2d 758 (2013). Based upon our de novo review of the record, we find the State established by clear and convincing evidence that it was in the best interests of the minor children that Brandon's parental rights be terminated.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order.

AFFIRMED.